UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,          Cr. No. 00-80974

          v.                District Judge Nancy G. Edmunds

LEON FORD, JR.,

          Defendant.

_____/

## MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)

Leon Ford, age 48, has been in custody for nearly 20 years serving a just over 40-year (483-month) sentence that was imposed:

- nearly 4 years before the Supreme Court vitiated the mandatory character of the sentencing guidelines in *United States v. Booker*, 543 U.S. 221 (2005);

- more than 15 years before the Court held in *Dean v. United States*, 137 S. Ct. 1170 (2017), that courts should consider the mandatory consecutive sentence required by 18 U.S.C. § 924(c) in fashioning an appropriate sentence on the remaining counts of conviction; and

- nearly 20 years before Congress clarified via the First Step Act that it never intended for "stacking" enhanced § 924(c) sentences for a first offense.

Bound by the sentencing guidelines and a misinterpretation of § 924(c) that Congress has since corrected, the Court had no choice but to impose a total sentence of 483-months imprisonment: 63 months on Counts One and Three (bank robbery),

plus consecutive sentences of 10 years and 25 years, respectively, on Counts Two and Four (possession of a firearm in furtherance of a crime of violence).

Now, based on the First Step Act's amendments to § 924(c), the Court would be required to impose a consecutive term of only 10 years on Count Four, and as made clear in *Dean*, the Court could impose whatever sentence it deemed appropriate on Counts One and Three. Even assuming the Court imposed the same 63-month term on the bank robbery counts, Mr. Ford would face a total sentence of just over 300 months.

The injustice of facing a term of incarceration more than a decade longer than Congress now deems warranted constitutes "extraordinary and compelling reasons" meriting his immediate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Ford was just 28 years old when he participated in the underlying bank robberies, none of which resulted in any physical injuries. Mr. Ford's 483-month sentence is incongruent with how similar conduct would be punished today.

In addition, Mr. Ford suffers diabetes, which places him at increased risk of serious health complications from the COVID-19 pandemic ravaging the BOP. Several courts, including in this district, have found that an inmate's diabetes, during this pandemic, is a "extraordinary and compelling reason" for release.

In the two decades since his arrest, Mr. Ford has completed a wide range of educational and therapeutic programming. He has completed more than 60

2

programs, and he is even a tutor for other inmates. His only disciplinary infractions occurred early in his incarceration: He has not sustained any infractions for the past several years (his current progress report notes none in the last six months). For the reasons stated below, the Court should exercise its discretion under § 3582(c)(1)(A)(i) to reduce Mr. Ford's sentence to time served, which is more than sufficient to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Counsel spoke to the assigned Assistant U.S. Attorney, Matthew Roth, who does not concur in this motion at this time.

## I.   BACKGROUND

### A. Trial and Sentencing

In June 2000, Mr. Ford was charged with two counts of bank robberies, one count of attempted bank robbery, and three corresponding § 924(c) charges. PSR ¶ 4. The prosecutor informed Mr. Ford's counsel: "I was trying to put together a plea agreement on Leon Ford and then realized I couldn't insult your intelligence by sending it out. My preliminary calculations show that Mr. Ford is looking at a minimum of 50 years in prison." (Ex. 5, AUSA Letter.)

In February 2001, Mr. Ford proceeded to trial. The jury convicted him of two bank robberies, and two § 924(c) charges, but acquitted him of the third attempted robbery and § 924(c) charge (Counts Five and Six). PSR ¶ 8. Even with the acquittals, Mr. Ford faced a mandatory minimum of 10 years on the first § 924(c),

an additional 25-year "stacked" mandatory minimum on the second § 924(c) count, and an addition consecutive mandatory guidelines range of 63 to 78 months. PSR ¶¶ 76-78. The lowest possible mandatory sentence was 483 months.

Mr. Ford, at the time of the offense, was a 28-year-old young man. He graduated high school and had employment history, but he had no children and no assets. He had only one prior conviction, committed when he was 19 years old. Counsel sought a downward departure at sentencing because he is an only child, and needed to care for his parents. (R. 50, Sent. Mem., PgID 113.) He also noted that no one was physically injured during the robberies and that the mandatory sentence was equivalent to a sentence for murder. (*Id.* at 111.) And he argued that the sentence was so grossly disproportionate and unfair that it violated the Eighth Amendment's prohibition on cruel and unusual punishment. (*Id.* at 113.)

At sentencing, this Court explained, "[C]andidly, if I were just sentencing on my own here, the sentence, without the mandatory statutes I wouldn't be sentencing in this range." (Ex. 1, Sent. Tr., at 21.) The Court "reluctantly" denied Mr. Ford's argument that the sentence was so "grossly disproportionate" as to be an Eighth Amendment violation, but noted that "[i]t certainly is higher than other bank robbery defendants" and "well beyond what it would have been a couple of years ago when it was still a five-year statute." (*Id.* at 22.)

4

Over the years, Mr. Ford has filed numerous pro se filings seeking relief from his sentence. None, to date, have been successful.

## B. First Step Act of 2018

On December 21, 2018, the President signed the First Step Act into law. Among other criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

The First Step Act's amendments to § 3582(c) were enacted to expand the use of compassionate release. *See id.* (titled "Increasing the Use and Transparency of Compassionate Release"). Prior to the Act's passage, motions for compassionate release could only be filed with the court by the Bureau of Prisons. The First Step Act gave prisoners the right to petition the court directly because the Bureau of Prisons had failed to meaningfully exercise its authority to pursue compassionate release for those who were eligible. *See, e.g.*, DOJ-OIG, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (2013), *available at* https://oig.

justice.gov/reports/2013/e1306.pdf ("The BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."). Between 1992 and 2012, the annual average number of prisoners who received compassionate release following a motion by the Bureau of Prisons was less than two dozen. *See, e.g.*, Human Rights Watch, *The Answer is No: Too Little Compassionate Release in US Federal Prisons* (2012), https://www.hrw.org/report/2012/11/30/answer-no/too-little-compassionate-release-us-federal-prisons.

The First Step Act not only gave prisoners the right to petition the court directly for compassionate release, but it also required the Bureau of Prisons, within one year of the Act's passage, to submit a detailed report to Congress on the use of compassionate release, *see* 18 U.S.C. § 3582(d)(3)—yet another indication that Congress intended that more individuals receive compassionate release than had previously. *See, e.g.*, Brian Schatz, *Schatz Legislation on Compassionate Prison Release Passes Senate in Sweeping Criminal Justice Reform Bill* (Dec. 18, 2018),

6

https://www.schatz.senate.gov/press-releases/schatz-legislation-on-compassionate-prison-release-passes-senate-in-sweeping-criminal-justice-reform-bill ("Too many people who are eligible for compassionate release die in prison because the decision takes so long.  And many others wait for months just to get a response.  Clearly, the system is broken."); 164 Cong. Rec. S7649 (daily ed. Dec. 18, 2018) (statement of Sen. Cardin) ("[T]his legislation includes several positive reforms from the House-passed FIRST STEP Act . . . The bill expands compassionate release under the Second Chance Act and expedites compassionate release applications.").

**C. Institutional Requests for Compassionate Release**

On January 1, 2020, Mr. Ford petitioned the Warden of FCI Pekin for compassionate release. (Ex. 2, Appl. for Compassionate Release.) He listed two reasons: (1) His diabetes resulting in blindness in his right eye, and (2) the changes to the law regarding "stacked" sentences under 18 U.S.C. § 924(c). He listed his release address, and that he intends to petition for disability benefits if released. He explained that he has tried to make the best of his time in custody, completing 65 classes, and is not a danger to the community, especially "since now [he] cannot see hardly at all." (*Id.* at 4.)

The Warden responded on February 27, 2020, denying Mr. Ford's request. (Ex. 3, Warden's Response.) The Warden reasoned that Mr. Ford did not meet the criteria for being a person with a debilitated medical condition.

## II.   ARGUMENT

Thanks to the First Step Act, Mr. Ford can now come directly to the Court to request a reduction of his sentence. In determining whether "extraordinary and compelling reasons" justify Mr. Ford's immediate release, the Court is not limited to the reasons specifically identified in subsections (A), (B), or (C) of application note 1 of U.S.S.G. § 1B1.13. Rather, the Court can determine whether an extraordinary and compelling reason "other than, or in combination with" Mr. Ford's age, medical condition, or family circumstances warrants sentencing relief. U.S.S.G. § 1B1.13, app. n.1(D).

The many mitigating factors presented in this case constitute extraordinary and compelling reasons that provide the Court with the power to reduce his sentence pursuant to § 3582(c)(1)(A)(i). These factors include: (1) Mr. Ford's relative youth at the time of the instant offense, (2) the draconian sentence imposed on him as a result of a misinterpretation of § 924(c) that the First Step Act has finally corrected, (3) Mr. Ford's rehabilitative potential (which has been borne out by his conduct in custody), and (4) Mr. Ford's susceptibility to COVID-19 because of his diabetes. After balancing the § 3553(a) factors, the Court should reduce Mr. Ford's sentence to time served.

**A. Congress did not limit "extraordinary and compelling reasons" to a specific, enumerated set of circumstances.**

As amended by the First Step Act, the aim of the compassionate release statute can no longer fall victim to the Bureau of Prisons' inaction. *See United States v. Bucci*, 409 F. Supp. 3d. 1, 2 (D. Mass. Sept. 16, 2019). By granting defendants direct access to the court, the First Step Act returns the ability to grant relief in appropriate circumstances to where it belongs: the courts. Section 3582(c)(1)(A) empowers the sentencing court to reduce a final term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction." Congress has not defined what constitutes an extraordinary and compelling reason. The only substantive statutory limitations are that rehabilitation, standing alone, is not sufficient, 18 U.S.C. § 994(t), and that a reduction must be "consistent with the applicable policy statements issued by the Commission." 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's policy statement is clear that extraordinary and compelling reasons are not restricted to finite circumstances. The policy statement contains four provisions that delineate extraordinary and compelling reasons, including age, medical reasons, family circumstances, and a catchall provision. *See* U.S.S.G. § 1B1.13, app. n.1. The catchall provision, entitled "Other Reasons," broadly encompasses "an extraordinary and compelling reason other than, or in combination with" a person's age, medical condition, or family circumstances. *Id.*

at 1(D). While the catchall provision contemplates that such other reasons be determined by the Director of the Bureau of Prisons, the policy statement's deference to the Bureau of Prisons regarding the procedure and standards for compassionate release is outmoded and irreconcilable with the text and purpose of the amended statute, which "trumps the Guidelines." *Dorsey v. United States*, 567 U.S. 260, 266 (2012). Indeed, the Commission has not updated § 1B1.13 since the enactment of the First Step Act because it lacks the quorum necessary to amend the guidelines. *See United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019). Accordingly, those portions of the policy statement limiting the determination of other circumstances warranting compassionate release to the discretion of the Director of the Bureau of Prisons to "no longer explain an appropriate use" of § 3582(c)(1)(A) and must be read out, as they conflict with the statute. *See, e.g.*, *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (explaining that the reference to the BOP Director determining when extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts. Deferring to the BOP would seem to frustrate that purpose.").

Indeed, a growing number of district courts have concluded that the First Step Act gives sentencing courts the broad discretion previously reserved to the Director of the Bureau of Prisons to use Application Note 1(D) of § 1B1.13 to determine if any extraordinary or compelling reasons other than age, medical conditions, or family circumstances exist. *See, e.g., United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) (joining "other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)"); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kansas Mar. 11, 2020) (joining the "majority" of courts that "have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it").

Considering the First Step Act's objective to increase the use of compassionate release and the means taken to do so by weakening the Bureau of Prisons' authority, the sentencing court is not constrained by the Bureau of Prisons' determination of what constitutes other "extraordinary and compelling reasons" meriting release and has broad discretion to decide in the first instance whether such reasons justify sentencing relief.

**B. The unfairness of the "stacking" § 924(c) sentences in this case are extraordinary and compelling reasons to reduce Mr. Ford's sentence.**

Just as judges around the country have done, the Court should find extraordinary and compelling reasons exist for Mr. Ford's immediate release based on a combination of factors, including the gross disparity between the sentence Mr. Ford received and the sentence he would have received after the First Step Act. Below is a chart of other decisions finding that the First Step Act's clarification that Congress never intended "stacked" § 924(c) sentences meets the compassionate-release standard, several of which also involve armed bank robberies:

| | |
|---|---|
| *United States v. Urkevich,*<br>No. 03-cr-37, 2019 WL 6037391<br>(D. Neb. Nov. 14, 2019) | Reducing 70.6-year sentence for drug-related § 924(c) crimes to 30.6 years because of changes to § 924(c) stacking |
| *United States v. Maumau*,<br>No. 08-cr-758, 2020 WL 806121<br>(D. Utah Feb. 12, 2020) | Granting resentencing of 55-year sentence because of changes in how § 924(c) sentences are calculated |
| *United States v. O'Bryan*,<br>No. 96-10076-03, 2020 WL 869475<br>(D. Kan. Feb. 21, 2020) | Reducing sentence of 29.25 years to 14.25 for same reason |
| *United States v. Young*,<br>No. 00-cr-00002-1, 2020 WL 1047815<br>(M.D. Tenn. Mar. 4, 2020) | Granting resentencing because of same reasons for person sentenced to 92.25 years for a series of armed bank robberies |
| *United States v. Redd*,<br>No. 97-cr-0006, 2020 WL 1248493<br>(E.D. Va. Mar. 16, 2020) | Reducing sentence of 50.25 years, for a series of bank robberies, to 20.25 years |
| *United States v. Owens*,<br>No. 97-CR-2546-CAB, ECF 93<br>(S.D. Cal. Mar. 20, 2020) | Reducing sentence of 33 years and 1 month, for six armed bank robberies, to time served |
| *United States v. Decator*,<br>No. 95-0202, 2020 WL 1676219<br>(D. Md. Apr. 6, 2020) | Reducing 52.75-year sentence for several armed bank robberies to time served (about 25 years) |

| | |
|---|---|
| *United States v. McPherson*,<br>No. 94-5708, 2020 WL 1862596<br>(W.D. Wash. Apr. 14, 2020) | Reducing 32.6-year sentence for armed bank robberies to time served (about 26 years) |
| *United States v. Wade*,<br>No. 99-cr-00257, 2020 WL 1864906<br>(CD Cal. Apr. 13, 2020) | Reducing 73-year sentence for a string of armed robberies to time served (about 20 years) |
| *United States v. Marks*,<br>No. 03-CR-6033L, 2020 WL 1908911<br>(W.D.N.Y. Apr. 20, 2020) | Reducing 40-year sentence for drug-related § 924(c) charges to 20 years |
| *United States v. Haynes*,<br>No. 93-cr-1043, 2020 WL 1941478<br>(E.D.N.Y. Apr. 22, 2020) | Reducing 46.5-year sentence for four armed bank robberies to time served (about 27 years) |
| *United States v. Brown*,<br>No. 05-cr-00227-1, 2020 WL 2091802<br>(S.D. Iowa Apr. 29, 2020) | Reducing 42.5-year sentence for drug-related § 924(c) crimes to time served |
| *United States v. Bryant*,<br>No. 95-202-3, 2020 WL 2085471<br>(D. Md. Apr. 30, 2020) | Reducing 53.1-year sentence for armed bank robberies to time served (about 25 years) |
| *United States v. Arey*,<br>No. 05-cr-00029, 2020 WL 2464796<br>(W.D. Va. May 13, 2020) | Reducing 74.5-year sentence for drug-related § 924(c) crimes to 32.5 years |

The sentence Mr. Ford received in 2001 was due to the then-available prosecutorial practice of "stacking" enhanced § 924(c) charges in the same indictment without a previous § 924(c) conviction—a practice that was condemned for years by the Sentencing Commission, the Judicial Conference of the United States, and others.  At the time of Mr. Ford's sentencing in 2001, § 924(c) required that a defendant convicted of "a second or subsequent conviction under this subsection" be sentenced to a term of imprisonment of not less than 25 years. The Supreme Court had interpreted this language to require stacking of the 25-year term for offenses charged in the same case, such that a defendant convicted of two

13

§ 924(c) counts in the same case would receive sentences of 5 and 25 years, consecutive to one another. *See Deal v. United States*, 508 U.S. 129 (1993).

In Section 403 of the First Step Act, titled a "Clarification of Section 924(c)," Congress made clear that it never intended the kind of staggering sentence Mr. Ford received. Striking the language "second or subsequent conviction," Congress re-wrote § 924(c) so that the enhanced mandatory minimum (25 years), may only be imposed for a violation that occurs after a prior conviction under § 924(c) has become final.  In other words, today, a defendant convicted of two § 924(c) counts in the same case would receive 10-year terms of imprisonment on each count (if a weapon was discharged) consecutive to one another. As one court noted, "Congress has spoken. Loudly. It has clarified its intended deployment of § 924(c) and expressly outlawed the stacking option responsible for [the defendant]'s incarceration today." *Haynes*, 2020 WL 1941478, at *18.

For Mr. Ford, this means that, if convicted today, he would face 10 years on Counts Two and Four. And because Mr. Ford was sentenced pre-*Booker*, even his sentences on Counts One and Three for the robberies themselves could be lower today, as "[n]othing [in § 924(c)] prevents a sentencing court from considering a mandatory minimum under § 924(c) when calculating an appropriate sentence for his predicate offense." *Dean*, 137 S. Ct. at 1178.

As one court noted, Mr. Ford's sentence is strikingly longer than those for the same or more serious crimes:

> Statistics compiled by the United States Sentencing Commission, for example, show that for fiscal year 2019, the average national sentence imposed for the crime of robbery is 109 months (9 years plus 1 month); for murder, 255 months (21 years, 4 months); for child pornography, 103 months (8 years, 7 month); and for "Extortion/Racketeering," 32 months (2 years, 8 months).

*Haynes*, 2020 WL 1941478, at *3.

Mr. Ford's indefensibly long sentence—which is greater than the sentences that many individuals convicted of murder receive today—is sufficient on its own to satisfy the "extraordinary and compelling reasons" threshold. As in *McPherson*, 2020 WL 1862596, at *5, this case presents a person sentenced to more than 40 years in prison for what is now viewed as a crime warranting a far less severe punishment. "It is extraordinary that a civilized society can allow this to happen to someone who, by all accounts, has long since learned his lesson." *Id.* Taken together with Mr. Ford's young age at the time the offenses in this case were committed, his limited criminal history, and his many post-sentencing accomplishments, there is no question that this Court has the authority to reduce Mr. Ford's sentence to time served and that it should exercise its discretion to do so.

15

**C. COVID-19 is another extraordinary and compelling reason for release.**

Moreover, as the BOP faces a health crisis because of COVID-19, several courts in this district have recognized that this pandemic, for an offender with risk factors rendering them vulnerable to severe complications from COVID-19, is an extraordinary situation warranting release under § 3582(c)(1)(A)(i). *United States v. Rahim*, No. 16-20433, 2020 WL 2604857, at *2 (E.D. Mich. May 21, 2020) (Edmunds, J.); *United States v. Saladrigas*, Cr No 13-20913, ECF No. 129 (E.D. Mich. May 13, 2020) (Borman, J.); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (Hood, C.J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093 (E.D. Mich. May 11, 2020) (Leitman, J.); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) (Levy, J.); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152 (E.D. Mich. Apr. 20, 2020) (Michelson, J.); *Samy v. United States*, No. CR 16-20610-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (Tarnow, J.).

First, the fact that Mr. Ford did not raise COVID-19 in his January 2020 request (before the pandemic hit BOP) is not a barrier to this Court's consideration of it in ruling on this motion. Neither *United States v. Alam*, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020), nor the text of § 3582(c)(1)(A) statute imposes an "issue-exhaustion" requirement. Erecting such a rule contradicts congressional intent. In any compassionate release case, courts will need to consider up-to-the-

minute medical information. Indeed, the statute expressly instructs the Court to consider the § 3553(a) factors, which will often include information available to the Court that may not have been available to the BOP in reaching its decision. The idea that a compassionate release case must be kicked back to BOP anytime an inmate discovers new information is not only unsupported by the statute and contrary to congressional intent, but counter to common sense.

If the text alone isn't reason enough, the Supreme Court also holds that issue exhaustion should not be required where "an administrative proceeding is not adversarial," and "the reasons for a court to require issue exhaustion are much weaker." *Sims v. Apfel*, 530 U.S. 103, 109 (2000) (citations omitted). The Court held that issue exhaustion was inappropriate in Social Security proceedings where neither party is represented by counsel and the proceedings are "inquisitorial rather than adversarial." *Id.* Requests for compassionate release within the BOP are even less adversarial than Social Security proceedings. To start, it is not a "proceeding"; the process is entirely non-adversarial: "[a] prisoner makes a request, and the warden decides whether to release the prisoner." *Brown*, 2020 WL 2091802, at *4. The warden acts as a judge, and there are no prosecutors or defense attorneys to make arguments for or against release. "Such a process more closely resembles the inquisitive Social Security proceedings in *Sims* than the adversarial proceedings

before this Court." *Id.* Issue exhaustion is therefore inappropriate, and this Court may consider *all* the grounds raised for compassionate release.

Mr. Ford is at an increased risk of death or serious illness from COVID-19 because of his diabetes. The Centers for Disease Control and Prevention (CDC) warn that people with diabetes are at a heightened risk of death or serious illness from COVID-19. CDC, *Coronavirus Disease 2019 (COVID-19), People Who Are At Higher Risk,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. In particular, "people with diabetes, of any kind, are vulnerable because, diabetes-related health problems 'can make it harder to overcome COVID-19.'" *Howard v. United States*, No. 16-CR-20222-2, 2020 WL 2615509, at *3 (E.D. Mich. May 22, 2020) (quoting CDC website). Thus, several courts have listed a person's diabetes when granting release in light of the COVID-19 pandemic. *See id.*; *Rahim*, 2020 WL 2604857, at *3 (collecting cases citing diabetes and other factors).

There are no current positive cases of COVID-19 at FCI Pekin. But once the disease arrives, it moves quickly. Another client of undersigned counsel's, Alvin Turner, contracted the virus at FCI Elkton in April and was dead within two weeks after reporting to medical staff. More than 5,600 inmates have contracted the disease in the past three months, and 72 inmates have died. Further, this Court recently explained it was "not persuaded that a lack confirmed cases alone is a compelling

reason not to grant relief if a defendant otherwise qualifies." *Rahim*, 2020 WL 2604857, at *3. "Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases." *Amarrah*, 2020 WL 2220008, at *3. BOP recently discovered 70% of tested inmates were positive for COVID-19. *Id.* (citing Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, THE WALL STREET JOURNAL (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-infederalprisons-have-coronavirus-11588252023.) Because of the lack of testing at federal facilities, and the lack of any ability for Mr. Ford to take proper precautions, this Court should find "that extraordinary and compelling circumstances warrant a reduction of Defendant's sentence." *Id.*

Release in these circumstances is consistent with the Sentencing Commission's policy statements. Specifically, Mr. Ford suffers "a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii); *see Rahim*, 2020 WL 2604857, at *2. Moreover, "Other Reasons" under U.S.S.G. § 1B1.13, cmt. n. 1(D), warranting compassionate release, because prison populations are subject to heightened vulnerability to the virus. *See Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020); *see also United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241 (S.D. Miss. May 1, 2020)

19

(granting release to a non-elderly inmate with no pre-existing conditions because of BOP's failure to control the outbreak at his facility).

## III.  THE § 3553(A) FACTORS WEIGH STRONGLY IN FAVOR OF MR. FORD'S IMMEDIATE RELEASE.

Mr. Ford's two decades in custody have shed new light on the § 3553(a) analysis as it applies to him, and which was constrained in 2001 by the then-mandatory guidelines and the "stacking" mandatory-minimum penalties on the § 924(c) counts. Under *Pepper v. United States*, 562 U.S. 476, 490–93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a), which provides "the most up-to-date picture" of the defendant's history and characteristics and "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Id.* at 492.  After considering all of the circumstances in this case, this Court should conclude that the nearly 20 years that Mr. Ford has already served, the equivalent of an approximately 24-year sentence after accounting for good-time credit, is more than sufficient to satisfy the purposes of sentencing.

Mr. Ford was sentenced to more than 40 years in prison at the age of 28. At the time of his sentencing, Mr. Ford had been convicted of just one prior offense, a 1991 robbery that occurred when he was just age 19. PSR ¶ 50.

Today, Mr. Ford is not the same young man who appeared before the Court for sentencing two decades ago. Approaching 50 years old, he accepts responsibility

20

for his prior mistakes and fully appreciates, and lives each day with, the repercussions of his actions. Mr. Ford's sincere remorse for his actions is best demonstrated by his exemplary institutional record in the Bureau of Prisons. He has no recent disciplinary history, and he has completed hundreds of hours of educational programming. (Ex. 4, Progress Report, and Certificates.) These include classes in vocational programming, such as job development, computer skills, tutoring, and financial literacy, as well as life-skills courses, such as parenting, wellness, and consciousness training.

While participating in a wide range of programming, Mr. Ford has worked as a tutor in the GED program, Mr. Ford's exceptional institutional record is a testament to the remorseful and peaceful 48-year-old man he has become and is a strong predictor of how he will perform on supervised released release if his more-than-40-year sentence is reduced.

At Mr. Ford's sentencing in 2001, it may have been difficult to predict how he would conduct himself 10, 20, or more years in the future. Even then the Court found the sentence higher than it would have imposed without the mandatory guidance it had to follow. (Ex. 1, Sent. Tr., at 21.) Today, however, the Court does not need to wonder. By participating in meaningful programming, serving others as a tutor, and maintaining clean disciplinary records, Mr. Ford has shown that he is prepared to conduct himself squarely within the confines of the law upon his release

from prison. Mr. Ford's exemplary conduct in the Bureau of Prisons and his efforts to prepare for his reentry show that further incarceration is unnecessary to provide specific deterrence and that his release would not pose a danger to the public. Following Mr. Ford's release, he will be supervised by the U.S. Probation Office for three years, during which time the Court can order placement in a halfway house or any other necessary transitional services.

While Mr. Ford's conduct was no doubt extremely serious, the more-than-40-year sentence mandated by law did not fit his crime, and Congress has since clarified that it never intended the huge sentence Mr. Ford received. Mr. Ford's post-sentencing conduct further confirms that the sentence was unduly punitive. A time-served sentence—which is the approximate equivalent of a 24-year sentence after accounting for good-time credit—remains an extremely serious sanction.  Indeed, it is commensurate with what people routinely receive today for substantially more serious conduct.

When evaluating whether a sentence reduction to time served satisfies the purposes of sentencing set forth in § 3553(a), the Court should consider that a time-served sentence brings Mr. Ford's sentence more in line with sentences imposed in post-First Step Act cases involving similar conduct and avoids him remaining in prison longer than significantly more culpable defendants being sentenced in this District and across the country today.

Finally, the Court should consider the need to promote respect for the law and to afford adequate general deterrence. The fact that the government has repeatedly recommended sentences substantially less than 40 years for defendants with just as serious (or more serious) conduct shows that the sentence Mr. Ford received is overly punitive. A time-served sentence continues to send a strong message of deterrence to anyone considering engaging in the same conduct that led to Mr. Ford's convictions.

Congress amended § 3582(c)(1)(A)(i) in order to expand the use of compassionate release, which, the Department of Justice has recognized, has been underutilized by the Bureau of Prisons. It promotes respect for the law to honor the legislative intent of Congress and to give Mr. Ford, who has done absolutely everything in his power to make amends for his past actions, a second chance.

## IV.   CONCLUSION

At age 28, Mr. Ford has served nearly 20 years of his sentence, yet his release date is still more than a decade away in June 2035. The changes effected by the First Step Act's amendment of § 924(c), together with Mr. Ford's relative youth at the time of the underlying offenses, the kinds of sentences imposed on equally or more culpable defendants today, and Mr. Ford's tremendous post-offense rehabilitation, constitute "extraordinary and compelling reasons" to reduce his sentence. The emergence of the COVID-19 pandemic and Mr. Ford's susceptibility to the virus

only increases the compelling reasons for release. Thus, Mr. Ford respectfully requests that the Court grant his motion for a reduction in sentence pursuant to § 3582(c)(1)(A)(i) and reduce his sentence to time served, with the 3-year term of supervision to follow his sentence remaining unchanged.

Respectfully submitted,

/s/ Benton Martin
BENTON MARTIN

/s/ Andrew Densemo
ANDREW DENSEMO

Counsel for Leon Ford
FEDERAL DEFENDER OFFICE
613 Abbott St., Suite 500
Detroit, Michigan 48226
Phone: 313-967-5832
Email: Benton_Martin@fd.org

Date: June 4, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                 Cr. No. 00-80974

              v.                    District Judge Nancy G. Edmunds

LEON FORD, JR.,

              Defendant.

_____/

## **CERTIFICATE OF SERVICE**

     I certify that, on the above date, I submitted this document via CM/ECF, which will notification to opposing counsel of record.

                                         */s/Benton C. Martin*